BREAUX, C. J.
Money paid in error and damages are the causes of action alleged by plaintiff.
During the fall and winter of 1905-06, plaintiff conducted a large cotton business, and bought cotton in Ruston and places adjacent. His own office was in Shreveport. He was represented in Ruston by McElroy & Hall, as his agents.
The defendants conducted a mercantile business in Bernice, Union parish. They sold a large number of bales of cotton to plaintiff.
The bank of plaintiff in Ruston was the Ruston State Bank. The plaintiff, being a merchant of ample means, effected an agreement with the bank, to the end of conducting its business at that place and to borrow money on overdrafts. To secure these overdrafts, all the cotton he bought was pledged to this bank until shipped. The bills of lading and compress receipts representing the cotton were placed in the bank as collateral. Monthly statements were forwarded and settlement made each month.
The bank was directed to honor checks drawn by Herman Loeb, per McElroy & Hall, charge him with them and retain the bill of lading as collateral security for amount thus paid.
On November 3, 1905, Selig & Cromwell drew on McElroy & 1-Iall for $1,900.33, which was paid by check of McElroy & Hall on the Ruston State Bank, and charged to plaintiff.
The following is written on this draft: “B. L. 37 B. C.”
The bill of lading representing the cotton sold was handed to the bank in accordance with the before mentioned agreement between plaintiff and the bank. Three days afterward the same drawers obtained a second amount, viz., $1,993.72, which was paid and charged by the bank in the same way.
Similar letters and figures appear in this draft: “B. L. 37 B. C.”
The bill of lading therefor was deposited with the bank.
In February, 1906, one of the members of the firm committed suicide, and the other left this state a fugitive. It then became generally known that the firm of McElroy & Hall was a defaulter, and that it had embezzled a large amount from plaintiff and others.
The 37 bales of cotton for which plaintiff had paid $1,993.72 was, it appears, the same lot of cotton for which plaintiffs had a few days before paid $1,960.33.
The plaintiff’s ground of suit is that he paid Selig & Cromwell twice for the same property; the bill of lading having been stolen from the bank by one of the firm of McElroy & Hall, and used a second time.
The defendants and plaintiff, through Mc-Elroy & Hall, agents, had had many business transactions together. They, the agents, were employed on a commission at 25 cents for each bale brought by them for plaintiff. These agents were well considered prior to their failure, which came on suddenly, not a long time after the cotton was purchased by them, and which has given rise to this suit. It *195 drove one to suicide, and the other, Hall, is a fugitive from justice.
At the first, when the cotton purchased was brought up, Cromwell, the active partner of Selig & Cromwell and in entire control (as the other partner is a woman), asked a higher price for the 37 bales of cotton in question than the agents of plaintiff felt authorized to pay, as they said, under the instructions which they had received from plaintiff. They said that, in view of the limit, they would buy the cotton for their own account.
One of the points of the case is that the agents were known to defendant as exclusively in the employment of plaintiff; but there is no evidence of employment of this firm by plaintiff to buy cotton for him alone. The firm of Selig & Cromwell did not know of any such limitation of employment. Or, at any rate, there is no evidence that defendants were notified of such limited employment. It was only when McElroy committed suicide that the fraudulent acts of that firm became known. Before that time, the first named member of the firm was regarded as an upright prosperous man.
After McElroy & Hall had bought the cotton, they obtained a bill of lading and delivered it to the Ruston State Bank, where it remained as a security for plaintiff’s overdraft, in accordance with the agreement between plaintiff and the bank, as before mentioned.
McElroy & Hall, after this bill of lading had been delivered to the bank, managed to obtain it from the bank upon some pretext which was accepted by the bank. They then, in order to carry out a fraudulent purpose, forwarded this bill of lading to the defendants, with instructions to draw on them for the amount, which the latter did; and defendants were also instructed to forward the bill of lading with the draft thus drawn.
The draft was drawn, and the bill of lading delivered to McElroy & Hall.
The cashier of the bank testified that the bill of lading was handed for the first time to McElroy & Hall by the bank, to whom the bank intrusted it to bring it back after it would have served the purpose for which it was taken out by them; that is, to make out some account of charges.
The plaintiff did not discover until some months after that the bill of lading had been misused.
The Facts in that Connection.
The draft was drawn and collected, and the amount placed to the credit of McElroy & Hall by the defendant in satisfaction of the indebtedness of McElroy & Hall to defendants. This indebtedness consisted of, as defendant Cromwell testified:
WON QCSIO BoPO-CO ooo o o o Cii
Total .
Very soon after this deal 'between McEl-roy & I-Iall and the defendants, they drew on defendants for an amount of about $400, an amount for which defendants would have to account over and above their claim satisfied for, as before mentioned, in the event it were held that they must return money received by them, as claimed by plaintiff.
Other facts will be stated in the opinion.
The judgment of the district court dismissed and rejected plaintiff’s demand. From that judgment, plaintiff appeals.
The Sale of the Ootton.
Defendants received the price for the same cotton twice is the plaintiff’s allegation.
With this view we have not found it possible to agree. We find the following: The first time the defendants sold to McElroy & Hall personally. They received the price from them. It does not appear that they had *197 any reason to suspect that it was otherwise than as represented by the firm of MeElroy & Hall. They proposed to the defendants to buy for their own account. The defendants had a right to and did accept the proposal.
Plaintiff’s contention is that the price was taken from his funds which he had deposited with the State Bank at Ruston. These funds had been deposited to the credit of MeElroy & Hall. If the -latter chose to expend them for cotton which they purchased on their own account, it is not a matter for which the defendants can be held responsible. The defendants are not to be condemned because they sold the cotton to these parties. The representations of these agents of plaintiff were that they had good reasons to buy on their own account.
Third Persons.
After the agents had become the owners to all intent and purpose, third persons were not concerned. They could do with their cotton as they pleased.. It was not for defendants to imagine that there was fraud committed by these agents to the prejudice of their principal. Their failure of these agents to buy the cotton in the name of their principal and their fraud in misemploying his funds was a breach of duty in his regard, which -a third person, unaware of, cannot very well be held for. These agents were competent to act for themselves. They had good credit, one of them particularly, and were well considered in the community. They were not mistrusted by their principal. Why should the vendors of cotton, as were the defendants, have been more suspicious of them than the plaintiff himself?
But it is said by plaintiff that the firm of MeElroy & Hall was to buy exclusively for him, and that, when they. proposed to buy for their own account, it was enough to place the defendants on their guard that there was something wrong. We do not see it in that light. The limitation of their agency to purchase cotton for the plaintiff alone does not appear to have been known to the defendants. In fact, it is very doubtful if there was such an agreement between these agents and the plaintiff.
To this point — that is, to the point which involved only the first sale to MeElroy & Hall by defendants — the case .presents no great difficulty to decide. But from this time on the issues are not easy to determine.
We have noted before that these agents desired to sell the cotton. They wished to transfer it to their principal, but for some reason deemed sufficient by the defendants they did not wish to sell in their own name. They, MeElroy & Hall, had made on account of the rise in cotton a small amount in the transaction — -that is, the cotton which they ■had bought as they asserted to the defendants was worth about $30 more — and, as they wished to realize that profit and did not care to explain particulars, they wanted it to go into the possession and ownership of the plaintiff at the then market rate.
The defendants consented to sell this cotton to MeElroy & Hall as they had sold other lots prior to the last, knowing that in selling it was for the plaintiff.
As to the sale defendants made to McEl-roy & Hall — that is, the first sale of November 7th — about this time these agents had taken advantage of the Bank of Ruston, and had obtained the bill of lading which had been -placed in possession of the bank as security for plaintiff’s overdraft. They forwarded this -bill of lading to the defendants as their own. They directed defendants to draw a draft as usual on them for the amount of the price of the cotton.
As they held the bill of lading for the cotton, there was nothing extraordinary in the fact that defendants believed that MeElroy & Hall controlled the situation; that they had full power in the premises.
*199 We have noted in our statement of the facts that defendants were the creditors of McElroy & Hall in the sum of $1,500. They were directed by these agents to pay themselves out of the amount which the agents authorized them to draw for upon themselves.
There was a balance left on the price (which the agents defendants assumed had collected on the price) and which defendants were entitled to of about $400.
The defendants are certainly out of pocket to the amount of $400, and they, it does seem, in view of the facts, can be held to have collected the sum which was due them on this amount.
The defendant Cromwell, who had charge of the business of his firm, testified that he drew on the agents McElroy & Hall in good faith, and forwarded the bills of lading in accordance with their instructions.
We have no dissent to express from the authorities cited by plaintiff, but they do not cover the ease here. We refer to Moran’s Heirs v. Société Catholique d’Education, etc., 107 La. 286, 31 South. 658, and Gerard v. McCormick, 130 N. Y. 261, 29 N. E. 115, 14 L. R. A. 234, cited by plaintiff.
The facts in the case here where not sufficient to place defendants upon inquiry. It was different in the- cited cases.
It was charged by plaintiff that defendants and their agents were guilty of “kiting that is, exchanging checks and drafts without consideration to keep up their credits. There was some “kiting” done, not to a great extent. It was stopped on the suggestion of the local bankers that it was not the proper thing to do. But this “kiting” does not appear to have been connected with or dependent on the transaction we have just reviewed and considered.
For reasons stated, the judgment is affirmed.
PROVOSTY, J., dissents.